**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 20-1471**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

INTELIQUENT, INC.,
*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,
*Respondents*,

_____

On Petition for Review of an Order of
the Federal Communications Commission

**BRIEF OF *AMICI CURIAE*
INTRADO COMMUNICATIONS, LLC F/K/A WEST TELECOM
SERVICES, LLC AND PEERLESS NETWORK, INC.
IN SUPPORT OF PETITIONER**

Philip J. Macres
KLEIN LAW GROUP PLLC
1250 Connecticut Ave. N.W.
Suite 700
Washington, DC 20036
(202) 289-6956
PMacres@KleinLawpllc.com

*Counsel for Intrado Communications,
LLC f/k/a West Telecom Services,
LLC, and Peerless Network, Inc.*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
## PURSUANT TO CIRCUIT RULE 28(a)(1)

A.    <u>Parties and Amici</u>.  All parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner.

B.    <u>Ruling Under Review</u>.  An accurate reference to the ruling at issue appears in the Brief for Petitioner.

C.    <u>Related Cases</u>.  An accurate statement regarding related cases appears in the Brief for Petitioner.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1(a) and 29(a)(4)(A), Fed. R. App. P, and Circuit Rule 26.1(a), *Amici Curiae* Intrado Communications, LLC f/k/a West Telecom Services, LLC and Peerless Network, Inc. hereby respectively submit the following corporate disclosure statements:

Intrado Communications, LLC f/k/a West Telecom Services, LLC ("Intrado") is a privately held corporation principally engaged in the business of offering network-based services to communications carriers and service providers. Intrado's parent company is Intrado Communications Holdings, LLC (which owns 100% of Intrado), which is ultimately controlled by Intrado Corporation, a privately-held Delaware corporation. No publicly-held company has a 10% or greater ownership interest in the Intrado Corporation or any of its subsidiaries.

Peerless Network, Inc. ("Peerless") is a privately held corporation also principally engaged in the business of offering network-based services to communications carriers and service providers. Peerless has no parent corporation, and no publicly held corporation has a ten percent or greater ownership interest in Peerless.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1) ................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF AMICI CURIAE ........................................................1

ARGUMENT ...........................................................................................2

I.    The FCC's Adoption of a $0.001 Rate Cap for 8YY Originating Tandem Switched Transport with No Link to Cost Was Arbitrary and Capricious .....3

      A.    The FCC's $0.001 Rate Cap for Tandem Switched Transport for 8YY Originating Traffic is Below-Cost. ......................................................6

      B.    The FCC's $0.001 Rate Cap for Tandem Switched Transport for 8YY Originating Traffic was Not Cost-Based ...........................................11

II.   The FCC's Failure to Consider the Requirements Codified by Federal Statutes and Regulations Governing Carrier Charges for 8YY Calling Was Arbitrary and Capricious. ...............................................................17

CONCLUSION .......................................................................................22

CERTIFICATE OF COMPLIANCE ......................................................24

CERTIFICATE OF SERVICE ...............................................................25

ADDENDUM ..................................................................................... A-1

      47 U.S.C.A. § 228 ........................................................................ A-1

      47 C.F.R. § 64.1504 ................................................................... A-12

      47 C.F.R. § 64.1515 ................................................................... A-14

# TABLE OF AUTHORITIES

**Cases**

*ALLTEL Corp. v. FCC*, 838 F.2d 551 (D.C. Cir. 1988) .......................................3, 21

*Ass'n of Oil Pipe Lines v. FERC*, 281 F.3d 239 (D.C. Cir. 2002) ...........................21

*Competitive Telecommunications Ass'n v. FCC*, 87 F.3d 522 (D.C. Cir. 1996) .......3

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989) ...............................................4

*Farmers Union Cert. Exchange, Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984) .......
................................................................................................................................8, 11

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................17

*In re FCC* 11-161, 753 F.3d 1015 (10th Cir. 2014) ................................................7

*Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ...
..............................................................................................................................18

*U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519 (D.C. Cir. 1978) ...................18

*United States v. Nixon*, 418 U.S. 683 (1974) ..........................................................18


**Statutes**

47 U.S.C. § 153(31) ...............................................................................................14

47 U.S.C. § 228(c)(7) ........................................................................ 18, 20, 21, 22

47 U.S.C. § 228(f)(2) ................................................................................ 18, 21, 22


**Regulations**

47 C.F.R. § 51.5 .....................................................................................................14

47 C.F.R. § 64.1504(a) ................................................................................... passim

47 C.F.R. § 64.1515 ........................................................................................ passim

47 C.F.R. § 65.1 . ......................................................................................................8

## Federal Communications Commission Orders and Bureau-Level Decisions

*Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459 (2017)..................................................................................................9

*Connect America Fund*, 26 FCC Rcd 17663 (2011) ............................................7, 9

*Implementation of the National Suicide Hotline Improvement Act of 2018*, 34 FCC Rcd 12562, 2019 WL 6888323, n.131 (2019)....................................................11

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151 (2001)............................................................................................7

*Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499 (1996)..........................................................................................7

*Teliax Colorado, LLC Tariff F.C.C. No. 1*, WC Pricing File No. 21-01, Transmittal No. 7, Order, DA 21-543, ¶¶ 8-9 (WCB PPD May 7, 2021), *available at* https://docs.fcc.gov/public/attachments/DA-21-543A1.pdf...............................11

*Technology Transitions*, 30 FCC Rcd 9372 (2015)....................................................9

*Worldcom, Inc. et al.*, 18 FCC Rcd 17722 (WCB 2003).........................................6

## Court Rules

Rule 29(a)(2), Fed. R. App. P. ...............................................................................2

Rule 29(a)(4)(E), Fed. R. App. P..........................................................................2

Rule 29(a)(4)(D), Fed. R. App. P..........................................................................1

## Other References

NECA Tariff F.C.C. No. 5 at Sec. 17.2.2 (14th Revised Page 17-10.2.1.2) .............8

*Petition for Reconsideration of the 8YY Access Charge Reform Order*, WC Docket No. 18-156, Public Notice, 36 FCC Rcd 167 (rel. Jan. 12, 2021)........................13

USTelecom-The Broadband Association Petition for Reconsideration, WC Docket No. 18-156 (filed Dec. 28, 2021), *available at* https://ecfsapi.fcc.gov/file/1228118483840/USTelecom%208YY%20PFR%20Draft%2012.28.20%20FINAL.pdf .........................................................................13

# GLOSSARY

| | |
|---|---|
| 8YY | Toll-Free |
| FCC | Federal Communications Commission |
| ILEC | Incumbent Local Exchange Carrier |
| IP | Internet Protocol |
| IXC | Interexchange Carrier (*i.e.,* provider of long-distance telephone calls) |
| LEC | Local Exchange Carrier |

## STATEMENT OF AMICI CURIAE

Pursuant to Rule 29(a)(4)(D), Fed. R. App. P., *Amici Curiae* Intrado and Peerless state that they are both competitive providers of telecommunications services principally engaged in the business of offering network-based services to other communications carriers and service providers. These "intermediate provider" services—which fall within a type of service known as "switched access services"—allow call traffic to be exchanged among the networks of various services providers that are interconnected with the respective networks of Intrado and Peerless.

When serving as intermediate providers, Intrado and Peerless do not have end-users from which recover the costs associated with their routing of the call traffic of their carrier customers. Rather, Intrado and Peerless must recover such costs by charging their carrier customers for switched access services. These services include "8YY originating tandem switched transport" service—the switching and transport functions used to route calls from (a) the network of the LEC that originated the call from the calling party's premises to (b) the network of the IXC that serves the 8YY customer.

In the *Order* under review, the FCC capped the rate that all carriers may charge for 8YY originating tandem switched transport service at $0.001 per minute of use. Intrado and Peerless thus have an interest in this case, because this FCC

adopted rate cap adversely affects the pricing of the 8YY originating tandem switched transport services provided by Intrado and Peerless.

Intrado and Peerless file this brief pursuant to the second sentence of Rule 29(a)(2), Fed. R. App. P., by consent of all parties. Intrado and Peerless filed their notice of intent to participate in this case as *Amici Curiae* on April 26, 2021.

Pursuant to Rule 29(a)(4)(E), Fed. R. App. P., Intrado and Peerless certify that no party's counsel authored this brief, in whole or in part; no party and no party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than Intrado, Peerless, and their counsel—contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

As demonstrated below, the FCC's adoption of the $0.001 rate cap for 8YY originating tandem switched transport in the *Order* was arbitrary and capricious because it was not based on and is far below the cost of providing tandem switched transport service. Moreover, the FCC's adoption of its below-cost rates in the *Order* unlawfully took the "free out of toll free," because callers that place 8YY calls will now incur charges for making 8YY calls. This directly violates existing federal statutes and regulations, as well as the well understood and basic meaning of "toll free." The Court should hold that the FCC's adoption of the $0.001 rate cap

for 8YY originating tandem switched transport service was arbitrary and capricious, and vacate and remand the *Order* accordingly.

## I.    The FCC's Adoption of a $0.001 Rate Cap for 8YY Originating Tandem Switched Transport with No Link to Cost Was Arbitrary and Capricious.

While "[t]he FCC is not required to establish purely cost-based rates….[, it] must, however, specifically justify any rate differential that does not reflect cost." *Competitive Telecommunications Ass'n v. FCC*, 87 F.3d 522, 529 (D.C. Cir. 1996) (citing *ALLTEL Corp. v. FCC*, 838 F.2d 551, 556-58 (D.C. Cir. 1988)). Petitioner's Brief explains that the FCC violated this requirement in setting a rate cap of $0.001 per minute of use for 8YY originating tandem switched transport service, because the FCC-adopted rate has no link whatsoever to the underlying cost to provide this service and therefore fails to ensure a reasonable cost-based rate for providers of these services. *Amici Curiae* supplement that discussion to demonstrate that the USTelecom-proposed rate cap of $0.001 adopted by the FCC is (a) not cost-based and (b) far *below* cost.

As a threshold matter, however, *Amici Curiae* cannot overemphasize to the Court that the setting of below-cost rates for 8YY originating tandem switched transport service is not only unlawful, but also extremely detrimental to competitive providers like Intrado and Peerless, because when they serve as intermediate providers, they do not have end-users from which to recover the costs

3

of providing this service. Rather, as intermediate providers and explained initially, their only avenue of cost recovery is to charge their carrier customers for the tandem switched transport services they provide. Thus, a requirement that intermediate providers assess below-cost rates to their carrier customers for these services is thus economically infeasible and effectively and unlawfully "confiscatory" to such providers. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).

In addition, apart from being unlawful, USTelecom's proposed rate cap of $0.001 *failed to reflect a consensus of the "entire industry," but rather a consensus of USTelecom's exclusive member companies that is not reflective of "all types of carriers" and "constituencies." See, e.g.,* Letter from John Barnicle, President and CEO, Peerless Network, Inc., and David Aldworth, President, Teliax, Inc., to Marlene Dortch, Secretary, FCC, WC Docket No. 18-156, at 2-3 (filed Apr. 27, 2020) ("Peerless Apr. 27, 2020 *Ex Parte*") (emphasis added) (JA__-__).

Moreover, USTelecom's largest members AT&T, Verizon, and CenturyLink—the likely chief proponents and architects of the USTelecom proposal—prefer a below-cost rate. They have other avenues for revenue recovery and/or cost reduction where rates for tandem switched transport service are set below-cost. In particular, unlike *Amici Curiae*, the ILEC affiliates of AT&T,

Verizon, and CenturyLink *do* serve end-users from which they may recover costs through increased subscriber charges. *See* Peerless Apr. 27, 2020 *Ex Parte* at 2 (JA___) (explaining that "USTelecom's *exclusive member companies [which include AT&T, Verizon and CenturyLink] seek to off-set revenue losses caused by USTelecom's proposed rate reductions with increases in the SLCs [which are assessed to end users] or through CAF ICC support*.") (emphasis in original).

Further, and more significantly, the IXC affiliates of AT&T, Verizon, and CenturyLink—which are long distance service providers that *collectively have over 90% of the market for retail and wholesale 8YY services—are the three largest customers/purchasers of 8YY originating tandem switched transport services*. Peerless Apr. 27, 2020 *Ex Parte* at 3-4 (JA__) (explaining that "USTelecom's Member Proposal overlooks the Verizon, AT&T, and CenturyLink [largely TDM-based] oligopoly in the 8YY marketplace [collectively, ("Dominant 8YY Providers")] as these massive IXCs provide over 90% of 8YY services to 8YY subscribers.") (JA__-__). These Dominant 8YY Providers will thus reap *enormous* costs savings from below-cost tandem switched transport rates—*savings that would far surpass any revenue reduction that their ILEC affiliates would incur. See id.* at 4-5 & 8 (JA__) (explaining that the 8YY marketplace, "is nowhere near being sufficiently competitive to effectively force these [Dominant 8YY Providers] to pass along and flow through their cost reductions from decreased originating

5

switched access charges for 8YY traffic by reducing their wholesale and retail rates for 8YY services to carriers and 8YY subscribers,'' which results in a "financial windfall" for these Dominant 8YY Providers). It is therefore not surprising that these Dominant 8YY Providers would architect or otherwise strongly support through USTelecom a below-cost rate for originating tandem switched transport rates associated with 8YY traffic, contrary to the FCC's assumption otherwise. *See Order,* ¶63 (JA__).

### A. The FCC's $0.001 Rate Cap for Tandem Switched Transport for 8YY Originating Traffic is Below-Cost.

The record below demonstrates that the FCC's adopted $0.001 rate cap for tandem switched transport for 8YY originating traffic is in fact below-cost. As Petitioner discusses at length, the only multi-carrier cost dataset submitted in the record below was the study provided by Petitioner. That study showed that a rate of at least $0.0017 per minute of use is needed to ensure cost-based rates for tandem switched transport services. This rate is supported by various evidence that the FCC arbitrarily ignored.

*First*, the $0.0017 rate aligns with those currently used in voluntarily negotiated arrangements in the competitive marketplace, which the FCC has recognized reflects "long-run incremental cost." *Worldcom, Inc. et al.*, 18 FCC Rcd 17722, 17739 ¶ 30 (WCB 2003) (stating the "[FCC]'s finding that prices in a competitive market will tend toward long-run incremental cost."); *Local*

*Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, 15845 ¶ 675 (1996) (subsequent history omitted) (explaining that "[i]n competitive markets, the price of a good or service will tend towards its long-run incremental cost."). For example, the $0.001 rate cap adopted by the FCC is more than 40% less than rates that Peerless has negotiated under existing commercial arrangements with IXCs—which rates are nearly identical to the $0.0017 that Inteliquent's study found to reflect long-run incremental costs. *See* Peerless Apr. 27, 2020 *Ex Parte* at 8 (JA___) (explaining that "Peerless, as a national tandem switching provider, even conducted an independent analysis of its own data and confirms that Inteliquent's proposed $.0017 rate represents 'an appropriate and justified national tandem rate.'").

Relatedly, consistent with FCC precedent, such negotiated rates can be used as a benchmark for setting switched access rates. *See, e.g., Connect America Fund*, 26 FCC Rcd 17663, 17887 ¶ 692, 17926 ¶ 784 (2011), *pets. for review denied sub nom. In re FCC* 11-161, 753 F.3d 1015 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 2072 (2015); *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151, 9190 ¶ 85 (2001) (subsequent history omitted) (using "rates reflected in recently negotiated interconnection agreements" as the basis for switched access service rate caps).

*Second,* other comparable cost-based rates currently in effect demonstrate that Inteliquent's cost-based rate of $0.0017 is on the *very low end* of the zone of reasonableness of costs that the FCC can rely on in setting rates, as costs of others are much higher. *See Farmers Union Cert. Exchange, Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984) (explaining "an agency may issue, and courts are without authority to invalidate, rate orders that fall within a 'zone of reasonableness,' where rates are neither 'less than compensatory' nor 'excessive.'" (citation omitted)).

For example, the record below reflects that the cost-based tariffed rates for tandem switched transport service of another carrier, Aureon, is $0.00411 per minute of use. *See Order,* at n.375 (JA__). The Court should also take notice that rate-of-return ILECs—whose rates are adopted based on cost-studies pursuant to FCC regulations (*see* 47 C.F.R. §§65.1 *et seq.*)—are authorized to charge a total rate of $0.006731 per minute of use for the rate elements that comprise tandem switched transport service, which is for Rate Band 1 (which has the lowest rates). *See* NECA Tariff F.C.C. No. 5 at Sec. 17.2.2 (14th Revised Page 17-10.2.1.2) ($0.002639 + (10 miles x $0.001046) x (2 x $0.0002) = $0.006731). In comparing the rates, Aureon and the rate-of-return cost-based rates are approximately 142 percent and 296 percent higher, respectively, than Inteliquent's proposed cost-based rate of $0.0017.

*Third*, while the FCC stated Inteliquent's proposed rate of $0.0017 is "dated," such costs are based on the use of "legacy [non-Internet Protocol]-based networks" (*see, e.g.,* Petitioner Brief at 19, 24, & 37-39), which are more expensive to operate *now* than when such costs were originally determined or in comparison to IP-based networks. *See Order,* at n.222 (JA___) (acknowledging that "IP services are generally less expensive to provide than TDM legacy services [which use non-IP-based networks]"); *Technology Transitions*, 30 FCC Rcd 9372, 9464 n.551 (2015) (noting "the cost savings that the incumbent LECs should realize from transitioning away from TDM networks and services [which use non-IP]-based networks]"); *Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459, 3585 ¶ 292 (2017) (explaining that "IP-based services ... *cost less* to provide than the TDM services [which use non-IP-based networks]") (emphasis in original). Contrary to the FCC's holding, because older technology needs to be used to route the traffic, Inteliquent's $0.0017 cost-based rate almost certainly understates carriers' current costs. *See Order*, ¶63 (JA___).[1]

Relatedly, while the FCC attempted to justify USTelecom's proposed $0.001 rate cap based on claims made by Bandwidth and its "lower-cost" IP-based tandem service (*Order*, ¶ 62 & n.222 (JA___)), Bandwidth's IP-based tandem service is not

---

[1] Currently, because the industry utilizes both newer and more efficient IP technology and more costly older TDM technology in their networks, carriers incur costs of IP-to-TDM media conversions. *See Connect America Fund*, 26 FCC Rcd 17663, 18132-33 ¶¶ 1361-64.

representative or otherwise appropriate for consideration for tariffed rate-setting purposes. As Petitioner explained, the FCC improperly treated "Bandwidth as representative of all tandem providers even though it is not,"… as it provides an "'[Internet Protocol] tandem equivalent' service." (Petitioner Brief at 37) Because this is a "fundamentally different type[] of service" (*id*.), the Court should take notice that Bandwidth *is not even shown as actually operating a tandem in the Local Exchange Routing Guide* (the "LERG")[2] that all carriers must access and use to properly route telephone calls through traditional tandem switching providers (which are providers using legacy non-IP-based networks).

Moreover, Bandwidth's "lower-cost[]" IP-based tandem service (*Order*, ¶ 62 (JA__)) *could never be tariffed with the FCC*, because its IP-based service apparently routes IP traffic that never touches the Public Switched Telephone Network ("PSTN")—which is the legacy non-IP-based network. Thus, the FCC's reliance on Bandwidth's assertions concerning its rate for IP-based tandem services *in the context of establishing a tariffed tandem switched transport rate for 8YY originating traffic was entirely improper*. Indeed, late on Friday, May 7, 2021, the FCC's Pricing Policy Division of the Wireline Competition Bureau, made this

---

[2] The LERG is "an industry guide … used by carriers in their network planning and engineering and numbering administration. It contains information regarding all North American central offices and end offices." *See Implementation of the National Suicide Hotline Improvement Act of 2018*, 34 FCC Rcd 12562, 2019 WL 6888323, n.131 (2019).

perfectly clear in holding that "IP traffic that never touches the PSTN may not be tariffed because such traffic falls outside of the regulated intercarrier compensation regime." *Teliax Colorado, LLC Tariff F.C.C. No. 1*, WC Pricing File No. 21-01, Transmittal No. 7, Order, DA 21-543, ¶¶ 8-9 (WCB PPD May 7, 2021), *available at* https://docs.fcc.gov/public/attachments/DA-21-543A1.pdf. These facts demonstrate the FCC improperly attempted to justify its $0.001 tariffed rate cap based on inferences it inappropriately derived from Bandwidth's assertions as an IP-based tandem service provider. *Order*, n.218 (JA__).

At bottom, the available data overwhelmingly demonstrates that the FCC-adopted rate cap of $0.001 is far-below cost and thus likewise far-below the lower bound "zone of reasonableness" that any deviation from cost-based pricing must fall within to meet the "just and reasonable" requirement. *See Farmers Union*, 734 F.2d at 1502.

## B. The FCC's $0.001 Rate Cap for Tandem Switched Transport for 8YY Originating Traffic was Not Cost-Based.

As explained in the Petitioner's Brief, the very nature of the proposal upon which the FCC relied for choosing the $0.001 rate cap demonstrates that the rate was not cost-based. Indeed, the FCC's selection of this rate was based solely on a "consensus proposal" of one trade organization, USTelecom.

USTelecom is a subset of the overall population of carriers that provide tandem switched transport services. *See* Peerless Apr. 27, 2020 *Ex Parte* at 2-3

(JA__-__) (explaining that USTelecom's proposal "while referred to as a 'Consensus Proposal' fails to be a consensus of the 'entire industry,' but rather a consensus of USTelecom's *exclusive member companies*" and further explaining that "contrary to [] USTelecom's claims, USTelecom's [] Proposal does not 'meet the needs of all types of carriers' and 'constituencies'").

To make matters worse, the proposal itself was assertedly based on rates charged by a subset of that subset—*i.e.*, select USTelecom members. *Order,* ¶61 (JA__-__) (stating that the USTelecom-proposed rate is "approximately at the midpoint of rates currently assessed by its larger members"). Thus, the proposal did not reflect an "industry consensus proposal," as the *Order* suggests, and had no record cost support. *Order*, ¶25 (JA__).

Further, USTelecom's proposed $0.001 rate cap was not proposed in isolation. Rather, under the USTelecom proposal, the $0.001 rate cap was tied to a separate proposal for implementation of new revenue recovery mechanisms for its large price cap ILEC members. *Order*, ¶¶85-86 & n.293 (JA__-__); *see also* Letter from Mike Saperstein, Vice President, Strategic Initiatives & Partnerships, USTelecom, to Marlene H. Dortch, Secretary, FCC, at 7-10 (filed Feb. 25, 2020) ("USTelecom Feb. 25, 2020 *Ex Parte*") (JA___) (proposing separate revenue recovery proposals for price cap carriers and rate-of-return carriers for revenue lost due to the FCC's 8YY reforms); Peerless Apr. 27, 2020 *Ex Parte* at 2 (JA__)

(explaining that under USTelecom's proposal of its exclusive member companies sought to "*off-set revenue losses caused by USTelecom's proposed rate reductions with increases in the SLCs or through CAF ICC support*") (emphasis in original). That is, the USTelecom proposal was constructed so that the reduced rates for 8YY originating switched access required separate revenue recovery allowances (*i.e.*, increased end-user charges) in order to be cost-neutral for its ILEC members.

Yet, while the FCC adopted USTelecom's proposed rates, it rejected the revenue recovery mechanism to which those rates were tied. *Order*, ¶85 (JA__). And while USTelecom seeks to have its proposed rates upheld in this appeal, the Court should take notice that USTelecom asked that the FCC reconsider its rejection of USTelecom's revenue recovery mechanism, claiming that price cap ILECs would not recoup their costs to provide 8YY originating switched access without it. *See Petition for Reconsideration of the 8YY Access Charge Reform Order*, WC Docket No. 18-156, Public Notice, 36 FCC Rcd 167 (rel. Jan. 12, 2021) (citing USTelecom-The Broadband Association Petition for Reconsideration, WC Docket No. 18-156 (filed Dec. 28, 2021), *available at* https://ecfsapi.fcc.gov/file/1228118483840/USTelecom%208YY%20PFR%20Draft%2012.28.20%20FINAL.pdf). Thus, *the $0.001 rate cap was proposed as a below-cost rate by design*.

Moreover, USTelecom's proposed $0.001 rate cap fails to acknowledge other significant costs of services actually provided in efficiently aggregating the long-distance traffic of the IXCs and delivering (or receiving) their traffic to/from them. Under the tandem switched transport rate structure prior to the *Order*, *Amici Curiae* not only aggregated the IXCs' traffic throughout many Local Access Transport Areas ("LATAs") throughout the United States,[3] via transport and tandem switching in each LATA, but also backhauled the IXCs' traffic hundreds of miles to a handful of regional/hub tandem switches in the United States. Under this arrangement, IXCs, such as the Dominant 8YY Providers, namely AT&T, Verizon and CenturyLink, are able to receive their long distance traffic on an aggregated basis. This in turn allowed the IXCs to avoid the cost and expense of interconnecting with *Amici Curiae* at each of their tandem switches within each of the LATAs where they operate.

For instance, in various LATAs within Florida, South Carolina, and Louisiana, Peerless routes the IXCs' long-distance traffic over its transport facilities to a tandem switch in each LATA (collectively, the "LATA Tandem Switch"). At each of these LATA Tandem Switches, Peerless aggregates each

---

[3] A LATA "is a contiguous geographic area— (1) Established before February 8, 1996 by a Bell operating company such that no exchange area includes points within more than 1 metropolitan statistical area, consolidated metropolitan statistical area, or State, except as expressly permitted under the AT&T Consent Decree; or (2) Established or modified by a Bell operating company after February 8, 1996 and approved by the Commission." 47 U.S.C. § 153(31); 47 C.F.R. § 51.5.

IXC's traffic and then Peerless backhauls the traffic hundreds of miles over its transport facilities to its regional/hub tandem switch in Atlanta. It is at this Peerless regional/hub tandem switch that many IXCs interconnect with Peerless. At this regional/hub tandem switch, Peerless aggregates the traffic (from all of Peerless's subtending LATA Tandem Switches) and then delivers the traffic to the appropriate interconnected IXC. By adopting a proposed rate without any consideration of the underlying network architecture used to deliver traffic to IXCs, the $0.001 rate cap fails to recognize other costs incurred in efficiently aggregating the long-distance traffic of the IXCs and delivering (or receiving) their traffic to/from them.

Accordingly, the FCC was flatly incorrect to assume that "the fact that a broad consensus of USTelecom member companies is willing to accept a lower rate would appear to confirm that Inteliquent's average rate is unlikely to reflect the USTelecom member companies' current costs." *Order*, ¶63 (JA__). As explained, USTelecom-member companies were *not* willing to accept a lower rate without contingent cost recovery rules that allowed them to obtain additional cost recovery through increased end-user charges. USTelecom members are also not similarly positioned to *Amici Curiae*, which do not have end-users from which to recover costs. Nor do *Amici Curiae*—unlike USTelecom members AT&T, Verizon, and CenturyLink, *i.e., the Dominant 8YY Providers*—have a dominant

market stranglehold in providing 8YY services that *will realize enormous costs savings from reduced rates for 8YY originating tandem switched transport*. *See* Peerless Apr. 27, 2020 *Ex Parte* at 3-4 (JA__) (explaining that 90% of 8YY services to 8YY subscribers are provided by these Dominant 8YY Providers) (JA__-__).

Finally, the FCC's stated concerns about "arbitrage and fraud" in connection with 8YY calling do not provide a sufficient, separate justification for deviation from cost-based rates. *See Order*, ¶41 (JA__). While the FCC relies on statements from AT&T and Verizon as support for its assertions regarding these concerns, Verizon and AT&T themselves do not characterize toll-free calls as fraud vis-à-vis their customers, as they are known to bill their 8YY customers for calls even where they dispute 8YY originating switched access charges. *See* Reply Comments of Teliax, Inc. and Peerless Network, Inc., WC Docket No. 18-156, at 4 (filed Oct. 1, 2018) (JA___) (explaining that "[m]uch of the real fraud in connection with 8YY calls occurs by the IXCs trying to obtain free Access Service. When the facts are exposed, they show AT&T and Verizon want CLECs to deliver 8YY calls the IXCs claim are fraudulent"). Furthermore, the Industry Traceback Group led by USTelecom, and working cooperatively with Invoca (which is a company that provides call tracking analytics) and Somos (which operates the 800 toll-free registry), has reduced toll-free traffic pumping fraud by more than 80% over the

past year. Accordingly, there is no factual basis to deviate from cost-based 8YY originating tandem switched transport rates to address vague concerns about fraud that the industry is already addressing in other ways.

For the foregoing reasons, the record demonstrates that the $0.001 rate cap adopted by the FCC—based solely on a proposal of a limited subset of carriers—is not grounded in the cost to provide service or any reasoned explanation to deviate from adopting a cost-based rate. Therefore, for these reasons and the reasons set forth in Petitioner's Brief, the Court should find that the FCC's adoption of a below-cost $0.001 rate cap for 8YY originating tandem switched transport service does not ensure a reasonable rate for intermediate tandem providers and is not justified by any reasoned explanation for deviating from a cost-based rate. The Court should thus find the FCC's adoption of the $0.001 rate cap was arbitrary and capricious and vacate and remand the *Order*.

## II. The FCC's Failure to Consider the Requirements Codified by Federal Statutes and Regulations Governing Carrier Charges for 8YY Calling Was Arbitrary and Capricious.

An agency action to change longstanding policy is arbitrary and capricious where such change lacks "a reasoned explanation…for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). This requirement "ordinarily demand[s] that [the agency] display awareness that it *is* changing position. An

agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* at 515 (emphasis in original and citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)); *see also Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (an agency's action is "arbitrary and capricious if the agency fails to comply with its own regulations.") (internal quotations omitted); *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978) (stating that "[an] agency is not free to ignore or violate its regulations while they remain in effect.").

Both federal statutes and the FCC's regulations explicitly prohibit charging a calling party for the cost to complete an 8YY or toll-free call. Section 228(c)(7) of the Federal Communications Act requires a common carrier to "*prohibit*…the use of any 800 telephone number, or other telephone number advertised or widely understood to be toll free, in a manner that would result in—(a) *the calling party being assessed, by virtue of completing the call, a charge for the call*." 47 U.S.C. § 228(c)(7) (emphasis added). Section 228(f)(2) further states that the "regulations prescribed by the Commission under this section shall permit a common carrier to recover its cost of complying with such regulations from providers of pay-per-call services, *but shall not permit such costs to be recovered from local or long distance ratepayers*." 47 U.S.C. § 228(f)(2) (emphasis added). FCC regulations 47

C.F.R. §§ 64.1504(a) and 64.1515 codify these statutory requirements.[4] These statutes and regulations reflect the long-standing requirement that IXCs providing 8YY services bear the cost of routing 8YY traffic, because it is their customers (*i.e.*, owners of the 8YY numbers) that encourage 8YY calls and thereby stimulate the associated traffic.

The corollary to this rule is that rates for 8YY switched access services must be set based on the cost to provide service. Indeed, if an IXC incurs below-cost rates for 8YY originating switched access services, then the individual dialing the 8YY call (*i.e.,* the "8YY caller") will necessarily bear the remaining cost to complete the 8YY call (via charges the 8YY caller's originating carrier assesses the 8YY caller). In other words, the setting of rates for 8YY switched access services below costs improperly "takes the free out of toll-free," which is entirely antithetical and contrary to the well understood meaning of toll-free. *See* Peerless Apr. 27, 2020 *Ex Parte* at 5 (JA___) (explaining that "consumers making 8YY calls expect that such calls can be made for free, *i.e.,* without being charged directly (on a per call basis) or indirectly (through increased SLC charges or USF

---

[4] *See* 47 C.F.R. § 64.1504(a) (stating that "A common carrier shall prohibit by tariff or contract the use of any 800 telephone number, or other telephone number advertised or widely understood to be toll-free, in a manner that would result in: (a) The calling party or the subscriber to the originating line being assessed, by virtue of completing the call, a charge for a call"); 47 C.F.R. § 64.1515 (stating that "[n]o common carrier shall recover its cost of complying with the provisions of this subpart from local or long distance ratepayers.").

fees), as USTelecom proposes to "take the free out of toll-free." Indeed, throughout this proceeding, parties have repeatedly emphasized that it is antithetical to charge, either directly or indirectly, the individuals dialing an 8YY call.")

While the FCC attempted to dismiss this basic and well understood concept as "misplaced," the *Order* never addresses Sections 228(c)(7) and (f)(2) of the Act or FCC Rules 64.1504(a) and 64.1515, nor does the *Order* provide any reasoned analysis for its conclusion that 8YY calls will somehow "remain toll free to consumers even after this Order takes effect." *Order*, ¶47 (JA__). Instead, the FCC attempts to overcome this antithetical issue by suggesting that the originating portion of the call is somehow irrelevant to the analysis at all—stating that the reforms "do not alter the fact that the ***toll portion*** of an 8YY call will still be paid by the called party, not the calling party, thereby preserving the *toll free* nature of 8YY calls." *Id*. (first emphasis added).

In other words, while the FCC concedes that under its adopted rate reforms the calling party will now bear part of the cost to route the call to the IXC—*i.e.*, the non-toll portion of the call)—it nonetheless concludes without support that this result is not a concern. But such conclusion is both illogical and untenable given the direct requirement imposed under Section 228(c)(7) of the Act and FCC Rule 64.1504(a), both of which unequivocally forbid a calling party from "being assessed, by virtue of completing the call, a charge for the call." 47 U.S.C. §

228(c)(7); 47 C.F.R. § 64.1504(a); *see also* 47 U.S.C. § 228(f)(2); 47 C.F.R. § 64.1515.

These rules require—at a minimum—that 8YY originating tandem switched transport charges be cost-based. Otherwise, the 8YY caller will be required to subsidize the so-called "non-toll" portion of the call for the benefit of the 8YY customer (*i.e., the entity that agreed to pay for the call in the first place*). Indeed, as discussed above, this subsidy was exactly what the USTelecom proposal demanded—*i.e.*, the setting of below-cost rates for 8YY originating switched access charges tied to a "revenue recovery" mechanism in the form of an increased service charge to the calling party.

While the FCC ultimately rejected implementation of a revenue recovery mechanism, it recognized that a waiver may be necessary to allow for originating carriers to seek additional revenue recovery—effectively conceding that the FCC did not sufficiently consider the cost to provide service when impose the rate cap for 8YY tandem switched transport. *Cf. ALLTEL Corp.*, 838 F.2d at 561 (stating that "[t]he FCC cannot save an irrational rule by tacking on a waiver procedure"). As Petitioner's Brief fully demonstrates, the FCC "cannot sustain otherwise unreasonable rules by relying on 'safety valve[s]' such as waivers, 'for then the exception would swallow the rule.'" Petitioner's Brief, at 42 (citing and quoting *Ass'n of Oil Pipe Lines v. FERC*, 281 F.3d 239, 244 (D.C. Cir. 2002)).

Therefore, the FCC's decision to adopt a $0.001 rate cap for 8YY tandem switch transport without cost-based support was arbitrary and capricious. Without such consideration, the FCC failed to articulate a satisfactory explanation as to how the adopted rates will guarantee carrier charges to end-users will remain compliant with Sections 228(c)(7) and (f)(2) of the Act, FCC Rules 64.1504(a) and 64.1515, and the policy objective that those laws serve—*i.e.*, to safeguard consumers from incurring charges for the cost to connect 8YY calls. The Court should therefore vacate and remand the *Order* as arbitrary and capricious for the FCC's failure to provide such an explanation.

## CONCLUSION

For the foregoing reasons, the Court should conclude that the FCC's adoption of the $0.001 per minute of use rate cap for 8YY originating tandem switched transport service was arbitrary and capricious, and vacate and remand the *Order* accordingly.

Dated: May 10, 2021                    Respectfully submitted,


*/s/ Philip J. Macres*
Philip J. Macres
KLEIN LAW GROUP PLLC
1250 Connecticut Avenue N.W.
Suite 700
Washington, D.C. 20036
Tel: 202-289-6956
Email: PMacres@KleinLawPLLC.com

*Counsel for Intrado Communications,*
*LLC f/k/a West Telecom Services, LLC,*
*and Peerless Network, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(4)(G), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 5,095 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1) and I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because the brief was prepared in 14-point Times New Roman font using Microsoft Word.


Dated:  May 10, 2021                          */s/ Philip J. Macres*            
                                              Philip J. Macres

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May 2021, I caused a copy of the foregoing *Brief of Amici Curiae Intrado Communications, LLC f/k/a West Telecom Services, LLC and Peerless Network, Inc. in Support of Petitioner* to be served through the CM/ECF system on all registered parties.

/s/ Philip J. Macres
Philip J. Macres
KLEIN LAW GROUP PLLC
1250 Connecticut Avenue N.W.
Suite 700
Washington, D.C. 20036
Tel: 202-289-6956
Email: PMacres@KleinLawPLLC.com

# ADDENDUM

## 47 U.S.C.A. § 228

### § 228. Regulation of carrier offering of pay-per-call services

**(a) Purpose**

It is the purpose of this section--

**(1)** to put into effect a system of national regulation and review that will oversee interstate pay-per-call services; and

**(2)** to recognize the Commission's authority to prescribe regulations and enforcement procedures and conduct oversight to afford reasonable protection to consumers of pay-per-call services and to assure that violations of Federal law do not occur.

**(b) General authority for regulations**

The Commission by regulation shall, within 270 days after October 28, 1992, establish a system for oversight and regulation of pay-per-call services in order to provide for the protection of consumers in accordance with this chapter and other applicable Federal statutes and regulations. The Commission's final rules shall--

**(1)** include measures that provide a consumer of pay-per-call services with adequate and clear descriptions of the rights of the caller;

**(2)** define the obligations of common carriers with respect to the provision of pay-per-call services;

**(3)** include requirements on such carriers to protect against abusive practices by providers of pay-per-call services;

**(4)** identify procedures by which common carriers and providers of pay-per-call services may take affirmative steps to protect against nonpayment of legitimate charges; and

**(5)** require that any service described in subparagraphs (A) and (B) of subsection (i)(1) be offered only through the use of certain telephone number prefixes and area codes.

**(c) Common carrier obligations**

Within 270 days after October 28, 1992, the Commission shall, by regulation, establish the following requirements for common carriers:

**(1) Contractual obligations to comply**

Any common carrier assigning to a provider of pay-per-call services a telephone number with a prefix or area code designated by the Commission in accordance with subsection (b)(5) shall require by contract or tariff that such provider comply with the provisions of titles II and III of the Telephone Disclosure and Dispute Resolution Act and the regulations prescribed by the Federal Trade Commission pursuant to those titles.

**(2) Information availability**

A common carrier that by tariff or contract assigns a telephone number with a prefix or area code designated by the Commission in accordance with subsection (b)(5) to a provider of a pay-per-call service shall make readily available on request to Federal and State agencies and other interested persons--

**(A)** a list of the telephone numbers for each of the pay-per-call services it carries;

**(B)** a short description of each such service;

**(C)** a statement of the total cost or the cost per minute and any other fees for each such service;

**(D)** a statement of the pay-per-call service's name, business address, and business telephone; and

**(E)** such other information as the Commission considers necessary for the enforcement of this section and other applicable Federal statutes and regulations.

**(3) Compliance procedures**

A common carrier that by contract or tariff assigns a telephone number with a prefix or area code designated by the Commission in accordance with subsection (b)(5) to a provider of pay-per-call services shall terminate, in accordance with procedures specified in such regulations, the offering of a pay-per-call service of

a provider if the carrier knows or reasonably should know that such service is not provided in compliance with title II or III of the Telephone Disclosure and Dispute Resolution Act or the regulations prescribed by the Federal Trade Commission pursuant to such titles.

**(4) Subscriber disconnection prohibited**

A common carrier shall not disconnect or interrupt a subscriber's local exchange telephone service or long distance telephone service because of nonpayment of charges for any pay-per-call service.

**(5) Blocking and presubscription**

A common carrier that provides local exchange service shall--

**(A)** offer telephone subscribers (where technically feasible) the option of blocking access from their telephone number to all, or to certain specific, prefixes or area codes used by pay-per-call services, which option--

**(i)** shall be offered at no charge (I) to all subscribers for a period of 60 days after the issuance of the regulations under subsection (b), and (II) to any subscriber who subscribes to a new telephone number until 60 days after the time the new telephone number is effective; and

**(ii)** shall otherwise be offered at a reasonable fee; and

**(B)** offer telephone subscribers (where the Commission determines it is technically and economically feasible), in combination with the blocking option described under subparagraph (A), the option of presubscribing to or blocking only specific pay-per-call services for a reasonable one-time charge.

The regulations prescribed under subparagraph (A)(i) of this paragraph may permit the costs of such blocking to be recovered by contract or tariff, but such costs may not be recovered from local or long-distance ratepayers. Nothing in this subsection precludes a common carrier from filing its rates and regulations regarding blocking and presubscription in its interstate tariffs.

**(6) Verification of charitable status**

A common carrier that assigns by contract or tariff a telephone number with a prefix or area code designated by the Commission in accordance with subsection (b)(5) to a provider of pay-per-call services that the carrier knows or reasonably

should know is engaged in soliciting charitable contributions shall obtain from such provider proof of the tax exempt status of any person or organization for which contributions are solicited.

**(7) Billing for 800 calls**

A common carrier shall prohibit by tariff or contract the use of any 800 telephone number, or other telephone number advertised or widely understood to be toll free, in a manner that would result in--

**(A)** the calling party being assessed, by virtue of completing the call, a charge for the call;

**(B)** the calling party being connected to a pay-per-call service;

**(C)** the calling party being charged for information conveyed during the call unless--

**(i)** the calling party has a written agreement (including an agreement transmitted through electronic medium) that meets the requirements of paragraph (8); or

**(ii)** the calling party is charged for the information in accordance with paragraph (9);

**(D)** the calling party being called back collect for the provision of audio information services or simultaneous voice conversation services; or

**(E)** the calling party being assessed, by virtue of being asked to connect or otherwise transfer to a pay-per-call service, a charge for the call.

**(8) Subscription agreements for billing for information provided via toll-free calls**

**(A) In general**

For purposes of paragraph (7)(C)(i), a written subscription does not meet the requirements of this paragraph unless the agreement specifies the material terms and conditions under which the information is offered and includes--

**(i)** the rate at which charges are assessed for the information;

**(ii)** the information provider's name;

**(iii)** the information provider's business address;

**(iv)** the information provider's regular business telephone number;

**(v)** the information provider's agreement to notify the subscriber at least one billing cycle in advance of all future changes in the rates charged for the information; and

**(vi)** the subscriber's choice of payment method, which may be by direct remit, debit, prepaid account, phone bill, or credit or calling card.

### (B) Billing arrangements

If a subscriber elects, pursuant to subparagraph (A)(vi), to pay by means of a phone bill--

**(i)** the agreement shall clearly explain that the subscriber will be assessed for calls made to the information service from the subscriber's phone line;

**(ii)** the phone bill shall include, in prominent type, the following disclaimer:

"Common carriers may not disconnect local or long distance telephone service for failure to pay disputed charges for information services."; and

**(iii)** the phone bill shall clearly list the 800 number dialed.

### (C) Use of PINs to prevent unauthorized use

A written agreement does not meet the requirements of this paragraph unless it--

**(i)** includes a unique personal identification number or other subscriber-specific identifier and requires a subscriber to use this number or identifier to obtain access to the information provided and includes instructions on its use; and

**(ii)** assures that any charges for services accessed by use of the subscriber's personal identification number or subscriber-specific identifier be assessed to subscriber's source of payment elected pursuant to subparagraph (A)(vi).

### (D) Exceptions

Notwithstanding paragraph (7)(C), a written agreement that meets the requirements of this paragraph is not required--

**(i)** for calls utilizing telecommunications devices for the deaf;

**(ii)** for directory services provided by a common carrier or its affiliate or by a local exchange carrier or its affiliate; or

**(iii)** for any purchase of goods or of services that are not information services.

### (E) Termination of service

On receipt by a common carrier of a complaint by any person that an information provider is in violation of the provisions of this section, a carrier shall--

**(i)** promptly investigate the complaint; and

**(ii)** if the carrier reasonably determines that the complaint is valid, it may terminate the provision of service to an information provider unless the provider supplies evidence of a written agreement that meets the requirements of this section.

### (F) Treatment of remedies

The remedies provided in this paragraph are in addition to any other remedies that are available under subchapter V of this chapter.

### (9) Charges by credit, prepaid, debit, charge, or calling card in absence of agreement

For purposes of paragraph (7)(C)(ii), a calling party is not charged in accordance with this paragraph unless the calling party is charged by means of a credit, prepaid, debit, charge, or calling card and the information service provider includes in response to each call an introductory disclosure message that--

**(A)** clearly states that there is a charge for the call;

**(B)** clearly states the service's total cost per minute and any other fees for the service or for any service to which the caller may be transferred;

**(C)** explains that the charges must be billed on either a credit, prepaid, debit, charge, or calling card;

**(D)** asks the caller for the card number;

**(E)** clearly states that charges for the call begin at the end of the introductory message; and

**(F)** clearly states that the caller can hang up at or before the end of the introductory message without incurring any charge whatsoever.

**(10) Bypass of introductory disclosure message**

The requirements of paragraph (9) shall not apply to calls from repeat callers using a bypass mechanism to avoid listening to the introductory message: Provided, That information providers shall disable such a bypass mechanism after the institution of any price increase and for a period of time determined to be sufficient by the Federal Trade Commission to give callers adequate and sufficient notice of a price increase.

**(11) "Calling card" defined**

As used in this subsection, the term "calling card" means an identifying number or code unique to the individual, that is issued to the individual by a common carrier and enables the individual to be charged by means of a phone bill for charges incurred independent of where the call originates.

**(d) Billing and collection practices**

The regulations required by this section shall require that any common carrier that by tariff or contract assigns a telephone number with a prefix or area code designated by the Commission in accordance with subsection (b)(5) to a provider of a pay-per-call service and that offers billing and collection services to such provider--

**(1)** ensure that a subscriber is not billed--

**(A)** for pay-per-call services that such carrier knows or reasonably should know was provided in violation of the regulations issued pursuant to title II of the Telephone Disclosure and Dispute Resolution Act; or

**(B)** under such other circumstances as the Commission determines necessary in order to protect subscribers from abusive practices;

**(2)** establish a local or a toll-free telephone number to answer questions and provide information on subscribers' rights and obligations with regard to their use of pay-per-call services and to provide to callers the name and mailing address of any provider of pay-per-call services offered by the common carrier;

**(3)** within 60 days after the issuance of final regulations pursuant to subsection (b), provide, either directly or through contract with any local exchange carrier

that provides billing or collection services to the common carrier, to all of such common carrier's telephone subscribers, to all new subscribers, and to all subscribers requesting service at a new location, a disclosure statement that sets forth all rights and obligations of the subscriber and the carrier with respect to the use and payment for pay-per-call services, including the right of a subscriber not to be billed and the applicable blocking option; and

**(4)** in any billing to telephone subscribers that includes charges for any pay-per-call service--

**(A)** display any charges for pay-per-call services in a part of the subscriber's bill that is identified as not being related to local and long distance telephone charges;

**(B)** for each charge so displayed, specify, at a minimum, the type of service, the amount of the charge, and the date, time, and duration of the call; and

**(C)** identify the toll-free number established pursuant to paragraph (2).

## (e) Liability

### (1) Common carriers not liable for transmission or billing

No common carrier shall be liable for a criminal or civil sanction or penalty solely because the carrier provided transmission or billing and collection for a pay-per-call service unless the carrier knew or reasonably should have known that such service was provided in violation of a provision of, or regulation prescribed pursuant to, title II or III of the Telephone Disclosure and Dispute Resolution Act or any other Federal law. This paragraph shall not prevent the Commission from imposing a sanction or penalty on a common carrier for a violation by that carrier of a regulation prescribed under this section.

### (2) Civil liability

No cause of action may be brought in any court or administrative agency against any common carrier or any of its affiliates on account of any act of the carrier or affiliate to terminate any pay-per-call service in order to comply with the regulations prescribed under this section, title II or III of the Telephone Disclosure and Dispute Resolution Act, or any other Federal law unless the complainant demonstrates that the carrier or affiliate did not act in good faith.

**(f) Special provisions**

**(1) Consumer refund requirements**

The regulations required by subsection (d) shall establish procedures, consistent with the provisions of titles II and III of the Telephone Disclosure and Dispute Resolution Act, to ensure that carriers and other parties providing billing and collection services with respect to pay-per-call services provide appropriate refunds to subscribers who have been billed for pay-per-call services pursuant to programs that have been found to have violated this section or such regulations, any provision of, or regulations prescribed pursuant to, title II or III of the Telephone Disclosure and Dispute Resolution Act, or any other Federal law.

**(2) Recovery of costs**

The regulations prescribed by the Commission under this section shall permit a common carrier to recover its cost of complying with such regulations from providers of pay-per-call services, but shall not permit such costs to be recovered from local or long distance ratepayers.

**(3) Recommendations on data pay-per-call**

The Commission, within one year after October 28, 1992, shall submit to the Congress the Commission's recommendations with respect to the extension of regulations under this section to persons that provide, for a per-call charge, data services that are not pay-per-call services.

**(g) Effect on other law**

**(1) No preemption of election law**

Nothing in this section shall relieve any provider of pay-per-call services, common carrier, local exchange carrier, or any other person from the obligation to comply with Federal, State, and local election statutes and regulations.

**(2) Consumer protection laws**

Nothing in this section shall relieve any provider of pay-per-call services, common carrier, local exchange carrier, or any other person from the obligation to comply with any Federal, State, or local statute or regulation relating to consumer protection or unfair trade.

**(3) Gambling laws**

Nothing in this section shall preclude any State from enforcing its statutes and regulations with regard to lotteries, wagering, betting, and other gambling activities.

**(4) State authority**

Nothing in this section shall preclude any State from enacting and enforcing additional and complementary oversight and regulatory systems or procedures, or both, so long as such systems and procedures govern intrastate services and do not significantly impede the enforcement of this section or other Federal statutes.

**(5) Enforcement of existing regulations**

Nothing in this section shall be construed to prohibit the Commission from enforcing regulations prescribed prior to October 28, 1992, in fulfilling the requirements of this section to the extent that such regulations are consistent with the provisions of this section.

**(h) Effect on dial-a-porn prohibitions**

Nothing in this section shall affect the provisions of section 223 of this title.

**(i) "Pay-per-call services" defined**

For purposes of this section--

**(1)** The term "pay-per-call services" means any service--

**(A)** in which any person provides or purports to provide--

**(i)** audio information or audio entertainment produced or packaged by such person;

**(ii)** access to simultaneous voice conversation services; or

**(iii)** any service, including the provision of a product, the charges for which are assessed on the basis of the completion of the call;

**(B)** for which the caller pays a per-call or per-time-interval charge that is greater than, or in addition to, the charge for transmission of the call; and

**(C)** which is accessed through use of a 900 telephone number or other prefix or

area code designated by the Commission in accordance with subsection (b)(5).

**(2)** Such term does not include directory services provided by a common carrier or its affiliate or by a local exchange carrier or its affiliate, or any service for which users are assessed charges only after entering into a presubscription or comparable arrangement with the provider of such service.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## 47 C.F.R. § 64.1504

§ 64.1504 Restrictions on the use of toll-free numbers.

A common carrier shall prohibit by tariff or contract the use of any 800 telephone number, or other telephone number advertised or widely understood to be toll-free, in a manner that would result in:

(a) The calling party or the subscriber to the originating line being assessed, by virtue of completing the call, a charge for a call;

(b) The calling party being connected to a pay-per-call service;

(c) The calling party being charged for information conveyed during the call unless:

(1) The calling party has a written agreement (including an agreement transmitted through electronic medium) that specifies the material terms and conditions under which the information is offered and includes:

(i) The rate at which charges are assessed for the information;

(ii) The information provider's name;

(iii) The information provider's business address;

(iv) The information provider's regular business telephone number;

(v) The information provider's agreement to notify the subscriber at least one billing cycle in advance of all future changes in the rates charged for the information;

(vi) The subscriber's choice of payment method, which may be by direct remit, debit, prepaid account, phone bill, or credit or calling card and, if a subscriber elects to pay by means of phone bill, a clear explanation that the subscriber will be assessed for calls made to the information service from the subscriber's phone line;

(vii) A unique personal identification number or other subscriber-specific identifier that must be used to obtain access to the information service and instructions on its use, and, in addition, assures that any charges for services accessed by use of the subscriber's personal identification number or subscriber-specific identifier be assessed to subscriber's source of payment

elected pursuant to paragraph (c)(1)(vi) of this section; or

(2) The calling party is charged for the information by means of a credit, prepaid, debit, charge, or calling card and the information service provider includes in response to each call an introductory message that:

(i) Clearly states that there is a charge for the call;

(ii) Clearly states the service's total cost per minute and any other fees for the service or for any service to which the caller may be transferred;

(iii) Explains that the charges must be billed on either a credit, prepaid, debit, charge, or calling card;

(iv) Asks the caller for the card number;

(v) Clearly states that charges for the call begin at the end of the introductory message; and

(vi) Clearly states that the caller can hang up at or before the end of the introductory message without incurring any charge whatsoever.

(d) The calling party being called back collect for the provision of audio or data information services, simultaneous voice conversation services, or products; and

(e) The calling party being assessed by virtue of the caller being asked to connect or otherwise transfer to a pay-per-call service, a charge for the call.

(f) Provided, however, that:

(1) Notwithstanding paragraph (c)(1) of this section, a written agreement that meets the requirements of that paragraph is not required for:

(i) Calls utilizing telecommunications devices for the deaf;

(ii) Directory services provided by a common carrier or its affiliate or by a local exchange carrier or its affiliate; or

(iii) Any purchase of goods or of services that are not information services.

(2) The requirements of paragraph (c)(2) of this section shall not apply to calls from repeat callers using a bypass mechanism to avoid listening to the introductory message: Provided, That information providers shall disable such a bypass mechanism after the institution of any price increase for a period of time determined to be sufficient by the Federal Trade Commission to give

callers adequate and sufficient notice of a price increase.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**47 C.F.R. § 64.1515**

§ 64.1515 Recovery of costs.

No common carrier shall recover its cost of complying with the provisions of this subpart from local or long distance ratepayers.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■