ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20-1471

INTELIQUENT, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of an Order of the Federal Communications Commission

## BRIEF OF USTELECOM – THE BROADBAND ASSOCIATION
## AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

SCOTT H. ANGSTREICH
KEVIN D. HORVITZ
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
khorvitz@kellogghansen.com

*Counsel for Amicus Curiae*
*USTelecom – The Broadband*
*Association*

June 24, 2021

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* USTelecom –

The Broadband Association ("USTelecom") certifies as follows:

## A.    Parties and *Amici*

All parties, intervenors, and *amici* appearing before the Federal

Communications Commission ("Commission") and in this Court are listed in the

briefs for petitioner and respondents.

## B.    Ruling Under Review

The ruling under review is the Commission's Report and Order, *8YY Access

Charge Reform*, WC Docket No. 18-156, FCC 20-143, 35 FCC Rcd 11594

(rel. Oct. 9, 2020) (JA___-__).  The version of this order published in the FCC

Record includes corrections that the Commission made in an erratum dated

October 30, 2020.  Changes from a second erratum, dated November 27, 2020,

were limited to an appendix and were separately included in the FCC Record as

*8YY Access Charge Reform*, 35 FCC Rcd 13176 (2020) (JA___-__).

## C.    Related Cases

Reference to related cases appears in the briefs for petitioner and

respondents.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amicus curiae* USTelecom submits the following corporate disclosure statement:

USTelecom is a non-profit association representing service providers and suppliers for the telecom industry. USTelecom members provide a full array of services, including broadband, voice, data, and video over wireline and wireless networks. Its diverse member base ranges from large publicly traded communications corporations to small companies and cooperatives — all providing advanced communications service to both urban and rural markets. USTelecom has no parent corporation and issues no stock.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..............i

CORPORATE DISCLOSURE STATEMENT..........................................ii

TABLE OF AUTHORITIES ...............................................................iv

GLOSSARY.................................................................................vi

IDENTITY AND INTEREST OF *AMICUS CURIAE*.............................1

INTRODUCTION AND SUMMARY OF ARGUMENT......................2

ARGUMENT ..............................................................................5

I.    THE COMMISSION PROPERLY SELECTED USTELECOM'S
      PROPOSAL AND REJECTED INTELIQUENT'S .......................5

      A.    A Critical Purpose of the *Order* Was To Substantially
            Mitigate Toll-Free Arbitrage ...............................6

      B.    The Commission Properly Adopted USTelecom's Proposed
            Rate Cap To Reduce Toll-Free Arbitrage.........................12

II.   INTELIQUENT'S COMPLAINTS THAT THE RATE CAP IS
      BELOW COST LACK MERIT .................................................19

      A.    Competitive Local Telephone Companies' Switched Access
            Rates Have Never Been Based on Their Costs...................19

      B.    Substantial Evidence Supported the Commission's Selection
            of USTelecom's Proposed Rate Cap .................................21

CONCLUSION ..........................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018)................................18

*Competitive Telecomms. Ass'n v. FCC*, 87 F.3d 522 (D.C. Cir. 1996)............14, 24

\* *Core Commc'ns, Inc.*, *In re*, 455 F.3d 267 (D.C. Cir. 2006) ..............4, 6, 12, 17, 24

*Core Commc'ns, Inc. v. FCC*, 592 F.3d 139 (D.C. Cir. 2010)................................17

*FCC 11-161*, *In re*, 753 F.3d 1015 (10th Cir. 2014) .....................................4, 19, 25

*Irregulators v. FCC*, 953 F.3d 78 (D.C. Cir. 2020) ................................21

*Nat'l Rural Telecom Ass'n v. FCC*, 988 F.2d 174 (D.C. Cir. 1993) .......................25

\* *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002) ........................................17


**ADMINISTRATIVE DECISIONS**

Memorandum Opinion and Order, *AT&T Corp. v. Wide Voice, LLC*, Proceeding No. 20-362, Bureau ID No. EB-20-MD-005, FCC 21-68 (rel. June 9, 2021)................................18

Order on Remand and Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 16 FCC Rcd 9151 (2001)......................................17, 23

Report and Order and Further Notice of Proposed Rulemaking, *Connect America Fund*, 26 FCC Rcd 17663 (2011)......................................24

---

\* Authorities principally relied upon are marked with an asterisk (\*).

Seventh Report and Order and Further Notice of Proposed
    Rulemaking, *Access Charge Reform*, 16 FCC Rcd 9923
    (2001) ..................................................................................................19, 20

## OTHER MATERIALS

Debtor's Post-Hearing Mem., *In re CoreTel Va., LLC*,
    No. 15-16717-RAG, Dkt. No. 238 (Bankr. D. Md.
    filed June 6, 2018), https://bit.ly/2xRaFam....................................................8

Excerpt of Deposition of Teliax President David Aldworth, *Teliax,*
    *Inc. v. AT&T Corp.*, No. 1:15-cv-01472-RBJ, Dkt. No. 68-1
    (D. Colo. filed Oct. 21, 2016), https://bit.ly/2sOWzAx.................................7

Lumen, *Wholesale Voice Solutions: Lumen Tandem*,
    https://www.lumen.com/wholesale/site/voice.html ......................................13

# GLOSSARY

| | |
|---|---|
| Ad Hoc 12/18/19 Ex Parte | Ex Parte Letter of Ad Hoc Telecom Users Committee, WC Docket No. 18-156 (filed Dec. 18, 2019) (JA___-__) |
| AT&T 1/13/2020 Ex Parte | Ex Parte Letter of AT&T Services, Inc., WC Docket No. 18-156 *et al.* (filed Jan. 13, 2020) (JA___-__) |
| Bandwidth 5/1/20 Ex Parte | Ex Parte Letter of Bandwidth Inc., WC Docket No. 18-156 (filed May 1, 2020) (JA___-__) |
| Commission | Federal Communications Commission |
| Inteliquent 7/31/17 Comments | Comments of Inteliquent, Inc., WC Docket No. 10-90 *et al.* (filed July 31, 2017) (JA___-__) |
| Inteliquent 12/21/17 Ex Parte | Ex Parte Letter of Inteliquent, Inc., WC Docket No. 10-90 *et al.* (Dec. 21, 2017) (JA___-__) |
| Inteliquent 12/20/19 Ex Parte | Ex Parte Letter of Inteliquent, Inc., WC Docket No. 18-156 (filed Dec. 20, 2019) (JA___-__) |
| Inteliquent 3/31/20 Ex Parte | Ex Parte Letter of Inteliquent, Inc., WC Docket No. 18-156 (filed Mar. 31, 2020) (JA___-__) |
| Inteliquent 10/1/18 Reply Comments | Reply Comments of Inteliquent, Inc., WC Docket No. 18-156 (filed Oct. 1, 2018) (JA___-__) |
| JA | Joint Appendix |

*Order*

Report and Order, *8YY Access Charge Reform*, WC Docket No. 18-156, FCC 20-143, 35 FCC Rcd 11594 (rel. Oct. 9, 2020) (JA___-__)

Somos 8/15/2017 Reply Comments

Reply Comments of Somos, Inc., WC Docket No. 10-90 *et al.* (filed Aug. 15, 2017) (JA___-__)

Teliax and Peerless 10/1/18 Reply Comments

Reply Comments of Teliax, Inc. and Peerless Network, Inc., WC Docket No. 18-156 (filed Oct. 1, 2018) (JA___-__)

USTelecom 2/25/20 Ex Parte

Ex Parte Letter of USTelecom – The Broadband Association, WC Docket No. 18-156 (filed Feb. 25, 2020) (JA___-__)

USTelecom 3/13/20 Ex Parte

Ex Parte Letter of USTelecom – The Broadband Association, WC Docket No. 18-156 *et al.* (filed Mar. 13, 2020) (JA___-__)

USTelecom 6/5/20 Ex Parte

Ex Parte Letter of USTelecom – The Broadband Association, WC Docket No. 18-156 (filed June 5, 2020) (JA___-__)

Verizon 7/31/17 Comments

Comments of Verizon, WC Docket No. 10-90 *et al.* (filed July 31, 2017) (JA___-__)

Verizon 9/4/18 Comments

Comments of Verizon, WC Docket No. 18-156 (filed Sept. 4, 2018) (JA___-__)

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

USTelecom is a non-profit association representing service providers and suppliers for the communications industry. Its members include companies that provide a full array of communications services, including broadband, voice, data, and video over wireline and wireless networks. USTelecom participated extensively in the proceeding before the agency and made the consensus proposal that the Federal Communications Commission ("Commission") adopted, part of which is the subject of petitioner's challenge in this case.[2] The challenged portion of the *Order* aims to remove the financial incentive to engage in arbitrage in connection with the provision of tandem services for toll-free calls. USTelecom represents a broad coalition of companies, including incumbent and competitive providers of tandem services for toll-free calls, both for their own end-user customers and for others' end-user customers, as well as members that pay for tandem services and are victims of the arbitrage schemes the *Order* is designed to address. For the reasons set forth in this brief and those in the Commission's brief, the Court should deny Inteliquent's petition for review.

---

[1] This Court's March 19, 2021 order granted USTelecom permission to participate in this case as *amicus curiae*. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amicus* represents that no counsel for any of the parties authored any portion of this brief and that no entity, other than *amicus* or its counsel, monetarily contributed to the preparation or submission of this brief.

[2] Report and Order, *8YY Access Charge Reform*, 35 FCC Rcd 11594, ¶ 52 (2020) ("*Order*") (JA___) ("[W]e . . . adopt[] the proposal made by USTelecom.").

## INTRODUCTION AND SUMMARY OF ARGUMENT

In recent years, businesses buying and offering toll-free service[3] have been subjected to a variety of brazen and harmful arbitrage schemes. Unlike spam calling directed at consumers at home and on their cell phones — where the spammers do not make money unless the person called takes some action — toll-free arbitrage calls generate money simply by being dialed. Local telephone companies bill "switched access" charges to the long-distance carriers selling toll-free service; those payments are then ultimately shared with the entities that generate the toll-free calls. As a result, local telephone companies compete to carry toll-free calls not on quality or price, but instead on how much they are willing to *pay* their "customers" to send them toll-free calls. Those "customers" are often themselves aggregators of toll-free calls that they purchase from others (and often from other aggregators): toll-free calls can change hands multiple times between when they are dialed and when they are answered. *See Order* ¶ 19 (JA___).

The availability of these payments has led unscrupulous actors to auto-generate hundreds of millions of artificial calls to toll-free numbers, which they sell to various aggregators. Others engage in additional forms of toll-free abuse —

---

[3] By "toll-free service," we mean calls to 800 and other "8YY" telephone numbers (such as 866, 877, and 888), where the called party pays the toll charges, not the calling party. *See Order* ¶ 1 (JA___-__) (describing 8YY calls).

on both artificially generated and legitimate toll-free calls — such as inefficiently routing the call through a remote location so that a higher rate can be charged. The businesses subscribing to toll-free service are left inundated with garbage calls and inflated bills, but often cannot detect the schemes in real time given both their own use of automated answering systems and the spammers' sophisticated schemes to disguise the artificial generation of toll-free calls. Those schemes also make it difficult for the long-distance carriers selling toll-free services to identify the artificial calling in real time, while the other arbitrage schemes are only discernable through investigations of local telephone companies' switched access bills and the underlying call records.

The Commission, as it has successfully done in the past to combat similar arbitrage schemes, adopted a rate cap in the *Order* designed to remove the financial incentive to engage in this economically inefficient and harmful conduct. USTelecom had proposed that cap, which was set at the approximate midpoint of the range of its members' existing tariffed charges, while also being low enough to deter arbitrage.

The Commission ably demonstrates that Inteliquent's and its *amici*'s challenges lack merit. USTelecom writes separately to make the following two points.

**I.**     The Commission properly selected USTelecom's proposed rate cap instead of Inteliquent's proposed cap, which was 70% higher.  Inteliquent's proposed rate cap was designed to be revenue neutral for Inteliquent.  It would not have adequately reduced the financial incentive to engage in the arbitrage schemes the Commission sought to remedy.  Inteliquent notably says nothing about the effectiveness of its proposed higher cap on mitigating those schemes, and the record showed that some such schemes could likely continue even at the lower cap the Commission adopted.  The Commission's decision to adopt that lower rate cap was a sound economic decision and consistent with its orders combatting arbitrage through the use of rate caps, which this Court has endorsed.  *See*, *e.g.*, *In re Core Commc'ns, Inc.*, 455 F.3d 267, 279 (D.C. Cir. 2006).

**II.**     Inteliquent's claim that the *Order* impermissibly deviates from cost-based rates ignores that the Commission "has specifically disclaimed reliance on cost to set . . . [switched] access rates" for competitive local telephone companies like Inteliquent.  *In re FCC 11-161*, 753 F.3d 1015, 1145 (10th Cir. 2014).  Indeed, competitive local telephone companies' switched access rates have *never* been cost-based.  Instead, those companies have been permitted for decades to tariff rates as high as the incumbents' rates, irrespective of their own costs.  The record showed that the generous gap between existing rates and costs is what allowed competitive local telephone companies to more than cover their tandem costs for

toll-free calls: they used long-distance carriers' payment of those rates to *purchase* the toll-free calls. The rate cap the Commission adopted is at the approximate midpoint of the range of existing charges and has the broad support of carriers that both sell and purchase tandem switching services for toll-free calls. While Inteliquent and its *amici* complain that the cap is below cost, they do not even assert, much less identify record evidence to prove, that the rate cap is below *their* costs of providing service.

## ARGUMENT

### I. THE COMMISSION PROPERLY SELECTED USTELECOM'S PROPOSAL AND REJECTED INTELIQUENT'S

The *Order* is designed to combat a wide variety of "[a]rbitrage and fraud" that has "increasingly . . . undermine[d] the system of intercarrier compensation that currently underpins toll free calling." *Order* ¶ 2 (JA___). Such schemes take various forms, including "traffic pumping" by entities that "are paid to make massive numbers of illegitimate calls to toll free numbers," as well as "benchmarking abuse" and "mileage pumping" by carriers that aggregate toll-free calls, which take advantage of higher rates that apply in certain areas or for transporting calls an inflated distance. *Id.* Inteliquent does not dispute the prevalence of these schemes, the need to combat them, or even the vast majority of the specific steps the *Order* adopts to address them.

5

In challenging the Commission's adoption of USTelecom's proposed rate cap for tandem services, Inteliquent never argues that its preferred 70% higher rate cap would effectively combat all the various arbitrage schemes that the Commission sought to address. The Commission's rejection of that rate cap in favor of one that would substantially reduce the financial incentive to engage in arbitrage was a well-reasoned policy decision of the type this Court has said it will not "second-guess." *In re Core Commc'ns*, 455 F.3d 267, 279 (D.C. Cir. 2006).

### A. A Critical Purpose of the *Order* Was To Substantially Mitigate Toll-Free Arbitrage

Under the intercarrier compensation rules that apply to toll-free calling, the long-distance carrier selling toll-free service is billed the tariffed rates of the local telephone company that hands it the call. The calling party has "no incentive to select the provider with the lowest access charges," *Order* ¶ 33 (JA___), because the calling party "does not pay for the toll call," *id.* ¶ 16 (JA___). This market distortion "*inherently* creates the opportunity for arbitrage and fraud," as the companies involved in originating toll-free calls "not only lack incentives to minimize intercarrier compensation charges but actually have an incentive to inflate those charges." *Id.* ¶ 33 (JA___). Even Inteliquent acknowledged that this mismatch in incentives inherently "creates the potential for abuse" in which the calling party's competitive local telephone company or "tandem provider" "may

impose unreasonably high fees on the [long-distance carrier]."  Inteliquent 7/31/17

Comments at 3 (JA___).

This has led to a marketplace in which toll-free calls are bought and sold in

bulk and change hands multiple times before reaching the long-distance carriers

that are billed the switched access charges that fund those purchases.  In the typical

scenario, these toll-free aggregators "insert[] [themselves] into the call path,"

*Order* ¶ 19 (JA___), by acquiring toll-free calls "from their ostensible wholesale

customers," Verizon 9/4/18 Comments at 3 (JA___), and then route the call to

whoever "is willing to pay the highest rate."  *Order* ¶ 19 (JA___).  The record

contained the testimony of the president of one aggregator (Teliax) that its

"wholesale customer[s]" — that is, the companies that have acquired dialed toll-

free calls — "get paid *by Teliax* to send us their traffic."[4]  This business model can

be highly lucrative.  For example, the record contained an explanation from the

CEO of another aggregator (CoreTel Communications) that "a purchase of X

---

[4] Excerpt of Deposition of Teliax President David Aldworth at 61:18-62:5,
*Teliax, Inc. v. AT&T Corp.*, No. 1:15-cv-01472-RBJ, Dkt. No. 68-1 (D. Colo. filed
Oct. 21, 2016), https://bit.ly/2sOWzAx (emphasis added) (quoted in Verizon
9/4/18 Comments at 3 (JA___)).

number of [originating toll-free] minutes for $100,000 . . . generates *multiples* of the $100,000 in [originating switched access charge] revenues."[5]

The precise mechanisms purchasers of toll-free calls use to maximize their switched access revenues vary. Because the long-distance carriers that offer toll-free service are billed for transport on a distance-sensitive, per-minute, per-mile basis, some toll-free aggregators engage in "mileage pumping" schemes. In these schemes, a competitive local telephone company "tariffs a per-mile charge for transport and then either (i) bills the [long-distance carrier] for transport it does not actually provide . . . or (ii) inefficiently routes traffic long distances — sometimes more than a hundred miles — to inflate the number of miles applied to the per-mile transport charge." *Order* ¶ 54 (JA___). In other instances, a company operating in one part of the country will send its toll-free calls to a company located in a different part of the country, where competitive local telephone companies' tariffed rates are higher. This practice, known as "benchmarking abuse," allows the latter company "to charge higher access charges relative to what the provider would have been able to charge in the . . . area where the call was actually placed." *Id.*

---

[5] Debtor's Post-Hearing Mem. at 9, *In re CoreTel Va., LLC*, No. 15-16717-RAG, Dkt. No. 238 (Bankr. D. Md. filed June 6, 2018), https://bit.ly/2xRaFam (emphasis added) (quoted in Verizon 9/4/18 Comments at 3 (JA___)).

¶ 18 (JA___); *see also* Inteliquent 12/20/19 Ex Parte at 2 (JA___) (describing this form of arbitrage).

However, the most "powerful incentive[] [is] for unscrupulous actors to take advantage of this broken market by generating traffic to [toll free] numbers for no purpose other than to inflate the access charge revenues that are ultimately paid by toll free service customers." *Order* ¶ 33 (JA___). These toll-free calls have "no legitimate purpose and exist[] solely for the purpose of obtaining intercarrier compensation." *Id.* ¶ 17 (JA___). In the typical scenario, a call generator, which can be located anywhere in the world, uses software to make a massive number of calls to toll-free numbers, which it then routes over the Internet to one or more of its partners. The partners then hand those toll-free calls to one or more competitive local telephone companies, which ultimately deliver the calls to tandem providers that deliver the calls to the long-distance carriers for delivery to the business that subscribes to the toll-free number. The money then flows in the opposite direction, with the tandem provider billing the long-distance carrier its tariffed switched access charges and then sending part of those payments to the competitive local telephone companies that sent it the calls and then so forth down the chain to the call generator. *See*, *e.g.*, AT&T 1/13/2020 Ex Parte at 2 (JA___). The goal of these schemes is to keep the toll-free calls going for as long as possible (to

generate the most switched access charges), while doing so in such a way as to avoid arousing suspicion. *See id.* at 2-3 (JA___-__).[6]

The record demonstrated that these traffic pumping schemes are extremely hard to detect. Unlike schemes involving spam calls to traditional phone numbers that make money only when the bad actor convinces the called party to do something — such as send money via Western Union or provide credit card or exploitable personal information — bad actors in the toll-free setting generate money simply by dialing toll-free calls. Toll-free customers are particularly susceptible to these types of schemes because they often use automated, interactive voice response systems that do not recognize that a human is not on the line, and the bad actors regularly "spoof" a new, legitimate telephone number with each call. *See Order* ¶ 17 (JA___); AT&T 1/13/2020 Ex Parte at 3 (JA___). As Somos, the Toll Free Number Administrator, explained, these calls are also "extremely difficult" to trace because the autodialer is usually overseas, and the call "likely passes through several wholesalers, resellers, VoIP providers and carriers, and

---

[6] *See also* Verizon 7/31/17 Comments at 4 (JA___) (explaining how the arbitrageur's autodialer or computerized systems may hit certain keys to prolong the length of calls); Somos 8/15/2017 Reply Comments at 2 (JA___) (explaining how traffic pumpers use a variety of methods, such as touchstone sounds or music, to trick automated answering machines into thinking there is a live caller on the line and prevent the call from being cut off).

mixes in with legitimate traffic." Somos 8/15/2017 Reply Comments at 2-3 (JA___-__).

The record also demonstrated that the schemes are prevalent and harmful. Indeed, "[t]he Toll Free Number Administrator estimates that up to 20% of toll free minutes for some carriers could be the result of traffic pumping." *Order* ¶ 41 (JA___). A commenter representing a group of businesses that purchase toll-free service provided an even higher rate: "A traffic analysis by one member's independent security consultant revealed that as much as 40% of the member's [toll-free] calls were fraudulent." Ad Hoc 12/18/19 Ex Parte at 3 (JA___). And Verizon observed that the toll-free calls it receives from some local telephone companies are *entirely* artificial. *See* Verizon 7/31/17 Comments at 4 (JA___). The Commission explained that these schemes "cause a wide variety of harms," including "inundating [toll-free] customers with unwanted calls that increase [their] expense," "congest[ing] incoming lines," and "caus[ing] other systems to be disrupted." *Order* ¶ 17 (JA___) (citing record evidence); *see also* Commission Br. 11-12 (detailing additional harms cited in the *Order*).

The Commission recognized that narrow solutions to this problem would be "impractical and unworkable as a matter of day-to-day implementation," and "would continue to place the burden of detection and enforcement on [toll-free] providers, rather than on the carriers that are abusing the current access charge

regime." *Order* ¶ 35 (JA___).  It found that reducing the available switched access rates "is more likely to eliminate these practices than targeted measures." *Id.* Indeed, "[w]ithout eliminating the financial incentives to engage in arbitrage," the Commission "would continually find itself reacting to new arbitrage schemes designed to exploit our rules, given the creativity and adaptability of entities engaging in arbitrage." *Id.*  Most pertinent here, the Commission noted that, given its decision to "transition [toll-free] originating end office charges to bill-and-keep," it also had to "begin the transition of originating [toll-free] tandem switching and transport charges toward bill-and-keep" lest it "create incentives for carriers to shift the focus of their [toll-free] arbitrage schemes to tandem switching and transport charges." *Id.* ¶ 55 (JA___).

## B. The Commission Properly Adopted USTelecom's Proposed Rate Cap To Reduce Toll-Free Arbitrage

The Commission's recognition that its shift to bill-and-keep for end-office charges would incentivize arbitrageurs to focus their schemes on tandem services, and its selection of USTelecom's evidence-based, proposed rate cap to disincentivize that arbitrage is the type of sound economic analysis that this Court should not "second-guess." *In re Core*, 455 F.3d at 279.

USTelecom's members include incumbent local telephone companies that provide tandem services for their own end-user customers' toll-free calls, as well as for the toll-free calls of other carriers.  And they also include a provider

(Level 3[7]) that, like Inteliquent, offers tandem services for toll-free calls in competition with the incumbent local telephone companies.[8] While USTelecom's members also include long-distance carriers that purchase tandem services and are among the victims of toll-free arbitrage, its membership includes many local telephone companies, including rural carriers that operate under rate-of-return regulation, that provide tandem services for toll-free calls but do not have a long-distance affiliate that purchases tandem services on toll-free calls.

USTelecom created its proposal by taking into account the "varying viewpoints of its members" to provide a "carefully balanced framework that achieves the Commission's goals of reducing arbitrage and inefficiencies in the intercarrier compensation system," while "allowing legitimate cost recovery." USTelecom "examined existing [tariffed] rates for tandem switching and transport services provided by [incumbent local telephone companies], modeling charges based on an assumed 10 miles of transport," and proposed a rate cap of $0.001 per minute for tandem services. USTelecom 2/25/20 Ex Parte at 1, 4, 5 & n.17 (JA___, ___, ___). As USTelecom explained, its proposed rate cap strikes "the

---

[7] Level 3 is now known as Lumen.

[8] *See* Lumen, *Wholesale Voice Solutions: Lumen Tandem*, https://www.lumen.com/wholesale/site/voice.html (advertising its tandem offering to wholesale customers to "[r]eplace [local telephone companies]" for "outbound toll-free" calls) (last visited June 24, 2021).

right balance as a reasonable midpoint between other existing . . . rates, the highest of which is $0.002828, and the lowest of which is $0.000418." *Id.* at 5 (JA___) (footnotes omitted). That approximate midpoint rate would allow the Commission to "achieve its goal of eliminating the primary source of [toll-free] traffic arbitrage." *Id.* And the Commission accurately concluded that there was a "pressing need" for reform and that "[r]educing the costs of [toll-free] arbitrage is more than sufficient justification for the rules [it adopted] in [the] *Order*." *Order* ¶ 41 (JA___); *see also Competitive Telecomms. Ass'n v. FCC*, 87 F.3d 522, 532 (D.C. Cir. 1996) (noting that departure from cost-based system can be "necessary and desirable").

Inteliquent does not contest the Commission's determination that it is important to combat toll-free calling arbitrage. Indeed, in comments directed to another action the Commission took in the *Order*, Inteliquent acknowledged that the Commission "should establish a rate that provides adequate compensation for the service provided, *but is not so high as to permit arbitrage*." Inteliquent 10/1/18 Reply Comments at 5 (JA___) (emphasis added). Yet, in arguing that the Commission erred by rejecting its proposed rate cap — which was 70 percent higher than the one the Commission adopted — Inteliquent never suggests that its preferred rate cap was "not so high as to permit arbitrage." Nor could it, as

Inteliquent's proposal perpetuated the very tariffed rates that are sufficiently high to enable those arbitrage schemes today.

This is not a bug of Inteliquent's proposal, but a primary feature. Although Inteliquent describes its proposal (at 22) as an "empirical study . . . regarding tandem rates and costs," Inteliquent adopted a rate cap that would be revenue neutral *for Inteliquent*. To develop its rate cap, Inteliquent compiled the different tariffed rates that it was charging for tandem switching and transport services on toll-free calls around the country, which (as explained below) mirror the rates of the incumbent local telephone companies in the areas in which Inteliquent operates. *See* Inteliquent 3/31/20 Ex Parte at 2 (JA___).[9] Inteliquent then multiplied those rates by the number of minutes *it billed* at each rate. *See id.* at 2-3 (JA___-__).[10] Dividing that total amount billed by the total number of minutes billed yields Inteliquent's "weighted national average" per-minute rate of $0.0017.

_____

[9] Inteliquent says (at 17) that it based its model on the rates of the incumbent local telephone companies in the areas in which it operates, but, as Inteliquent explains, "[c]ompetitive tandem providers, such as Inteliquent, charge a benchmark rate at or below the [incumbent local telephone company] rate." Inteliquent 3/31/20 Ex Parte at 3 n.7 (JA___).

[10] Inteliquent, like USTelecom, also assumed "10 miles of tandem facility mileage" on every call. Inteliquent 12/21/17 Ex Parte at 2 n.3 (JA___).

Thus, Inteliquent's rate cap was merely a "calculation specific to Inteliquent," Commission Br. 28, designed to achieve revenue neutrality for Inteliquent.[11]

Yet the record showed that a rate cap that was revenue neutral for Inteliquent would also be "high enough to enable a revenue share" of as much as $0.0012 to $0.0014. *See* Bandwidth 5/1/20 Ex Parte at 1-2 (JA___-__). Further evidence comes from one of Inteliquent's *amici*, Peerless — a toll-free calling "aggregator[]" that had entered into commercial agreements with long-distance carriers at rates "nearly identical" to $0.0017. Teliax and Peerless 10/1/18 Reply Comments at 7 (JA___); Intrado and Peerless *Amici* Br. 7. That rate was therefore clearly sufficient to enable Peerless to continue purchasing toll-free calls.

The Commission has previously explained that, when rates "ma[k]e it possible for [local telephone companies] . . . to afford to pay their own customers to use their services" — a "troubling" hallmark of "classic regulatory arbitrage" — the rates "provide[] an inducement to fraudulent schemes to generate . . . minutes,"

---

[11] Although Inteliquent proposed its rate cap in 2017, it continued defending it in 2020, suggesting that its traffic mix had not materially changed. *See* Inteliquent 12/21/17 Ex Parte at 2-3 (JA___-__) (proposing its "National Weighted Average" rate); Inteliquent 3/31/20 Ex Parte at 2 (JA___) (supporting the $0.0017 rate because it reflects Inteliquent's "national profile of [toll-free] minutes that it sends to [long-distance carriers]").

and reducing those rates is an effective means of deterring arbitrage.[12]  When this Court reviewed the Commission's decision to cap the rates for calls bound to Internet service providers at $0.0007 per minute, it noted the economic irrationality in carriers "making enough money from [intercarrier] compensation to pay their . . . customers for the privilege of completing the calls," and remanded without vacating, pointing to the disruptive effects of doing so.  *WorldCom, Inc. v. FCC*, 288 F.3d 429, 431 434 (D.C. Cir. 2002).[13]  This Court later upheld the Commission's denial of a petition for forbearance from that rate cap, noting that the Court will not "second-guess an agency's economic analysis" that the cap was needed to avoid "classic regulatory arbitrage."  *In re Core*, 455 F.3d at 279; *see also Core Commc'ns, Inc. v. FCC*, 592 F.3d 139, 145-46 (D.C. Cir. 2010) (upholding the Commission's retention of the $0.0007 rate cap on remand).

This Court should similarly not second-guess the agency's decision here to impose a cap sufficiently low to disincentivize classic regulatory arbitrage.  On the contrary, the Commission recognized it must act promptly to avoid "perpetuat[ing] incentives . . . to engage in traffic pumping and other arbitrage schemes."  *Order*

---

[12] Order on Remand and Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 16 FCC Rcd 9151, ¶¶ 21, 70, 78 (2001) ("*ISP Remand Order*").

[13] Vacating the Commission's transitional rate cap here, which is effective on July 1, 2021, would have similarly disruptive consequences.

¶ 50 (JA____).  And it recognized that, if it failed to sufficiently reduce the rate for tandem services at the same time as the other changes in the *Order*, it could lead to an increase in arbitrage practices in tandem services "not . . . unlike the shift in arbitrage practices that occurred when the Commission moved terminating end office rates to bill-and-keep but left certain terminating tandem switching and transport rates in place," which required the Commission to adopt a second set of rules to close those loopholes.  *Order* ¶ 55 (JA____).[14]  The Commission's decision to learn from its past mistakes and act swiftly to discourage all forms of toll-free arbitrage, while it gives further consideration to the ongoing issues raised by the transition to a bill-and-keep regime, was an exercise in reasoned decision-making and economic analysis that courts should give "[s]ubstantial deference."  *AT&T, Inc. v. FCC*, 886 F.3d 1236, 1246 (D.C. Cir. 2018).

---

[14] *See* Memorandum Opinion and Order, *AT&T Corp. v. Wide Voice, LLC*, Proceeding No. 20-362, Bureau ID No. EB-20-MD-005, FCC 21-68, ¶ 9 (rel. June 9, 2021) (explaining that the Commission had to issue its 2019 *Access Arbitrage Order* to "close [the] loophole" in its earlier order that had led "access-stimulating [local telephone companies] and their non-[telephone company] partners [to] adapt[] their practices to take advantage of terminating tandem switching and transport charges that were not being reduced to bill-and-keep"); *see also* Commission Br. 10 (noting that carriers "increasingly exploited . . . arbitrage opportunities inherent in the structure of toll-free access charges" after the *Transformation Order* reduced arbitrage involving "terminating" access charges) (brackets omitted).

## II.   INTELIQUENT'S COMPLAINTS THAT THE RATE CAP IS BELOW COST LACK MERIT

Although Inteliquent claims that the *Order* impermissibly deviates from cost-based rates, its tariffed rates — like the tariffed rates of all competitive local telephone companies — have *never* been cost-based.  Nor has the Commission ever looked to actual costs in setting arbitrage-eliminating rate caps in the past.  The Commission had more than enough basis to conclude that the $0.001 rate cap is sufficiently compensatory.  The reasonableness of that rate cap is further evidenced by the fact that Inteliquent and its *amici* never contend, let alone prove, that the rate cap is below *their* costs.

### A.   Competitive Local Telephone Companies' Switched Access Rates Have Never Been Based on Their Costs

Inteliquent's various arguments are premised on the notion that any deviation from cost-based rate-setting in the *Order* is arbitrary.  *See* Inteliquent Br. 22-24.  But competitive local telephone companies' switched access rates have *never* been based on their costs, and the Commission "has specifically disclaimed reliance on cost to set competitive [local telephone company] access rates."  *In re FCC 11-161*, 753 F.3d 1015, 1145 (10th Cir. 2014).

In 1996, when competitive local telephone companies first began to offer switched access services, the Commission allowed them to set their tariff rates without any ex ante regulation.  *See* Seventh Report and Order and Further Notice

of Proposed Rulemaking, *Access Charge Reform*, 16 FCC Rcd 9923, ¶ 21 (2001).

In 2001, however, the Commission addressed evidence that those new entrants —

which should have had lower costs than incumbent local telephone companies

given their use of newer equipment and ability to target the easiest-to-serve

customer segments — were tariffing rates *higher than* the incumbents' rates.  In

response, the Commission adopted rules governing the new entrants' tariffed rates.

*See id.* ¶ 34.  But the Commission did not require those competitive local telephone

companies to tariff rates based on their costs.  Instead, the Commission set up a

benchmarking regime, which let each new entrant tariff rates up to the rates of the

incumbent operating in the same territory — even if that competitive local

telephone company's costs were far lower than the incumbent's costs.  *See id.* ¶ 45.

Indeed, had the Commission taken no action in this proceeding, those

benchmarking rules would have required Inteliquent and its *amici* — and all other

competitive local telephone companies — to lower their tandem service rates to

$0.001 per minute if incumbent local telephone companies had voluntarily lowered

their tariffed rates to that figure.  *See* USTelecom 3/13/20 Ex Parte at 4 (JA___).

Under the Commission's benchmarking regime, Inteliquent and its *amici*

have for years been able to charge for tandem services at the same rates incumbent

local telephone companies had tariffed, without any consideration of the newer

entrants' lower costs.  It was precisely this regime that provided the ability for

competitive local telephone companies to cover their costs of carrying toll-free traffic even as they bought that traffic from third parties, thus funding the artificial generation of toll-free calls.

As the Commission demonstrates (at 24-25), the incumbent local telephone company rates that provide those benchmarks are untethered to the incumbents' costs. Indeed, the Commission's rationale for switching from traditional rate-of-return regulation to price-cap regulation in the early 1990s was to provide companies with the incentive to reduce their costs as far below the cap as they could. *See Irregulators v. FCC*, 953 F.3d 78, 80 (D.C. Cir. 2020). Although the "caps initially chosen" in 1990 "were the firms' then-existing rates," those caps have since been adjusted, and the amounts of the adjustments were "unlikely . . . to be significantly affected by [a firm's] success or failure at cost reduction." *Id*. And the Commission abandoned those adjustments *entirely* for most incumbent local telephone companies by 2004. *See* Commission Br. 24 n.5. Therefore, the Commission correctly concluded that the existing tariffed rates that Inteliquent used to develop its revenue-neutral (for it) rate cap were not cost-based. *See Order* ¶ 63 (JA___).

**B.  Substantial Evidence Supported the Commission's Selection of USTelecom's Proposed Rate Cap**

Substantial evidence supported the Commission's conclusion that its selection of USTelecom's proposed rate cap "would address negative incentives

that currently exist in the market while allowing legitimate cost recovery." *Order*

¶ 61 (JA___).  As USTelecom explained, the $0.001 per-minute rate cap — which

would also apply to its own members — is a "reasonable midpoint between other

existing [incumbent local telephone company] rates."  USTelecom 2/25/20 Ex

Parte at 5 (JA___).  The record showed that *many* incumbent local telephone

companies had tariffed tandem service rates at or *below* $0.001.  *See* USTelecom

6/5/20 Ex Parte at 1 n.3 (JA___) (compiling examples of tariffed rates at and below

$0.001).  Under the benchmarking rule, those are also the maximum tariffed rates

for the competitive local telephone companies, like Inteliquent, operating in those

incumbents' territory.

Non-USTelecom member and competing telephone company Bandwidth

also agreed that $0.001 was an above-cost rate — indeed, it worried that the rate

cap would still be high enough to fund some toll-free arbitrage via revenue sharing.

Bandwidth 5/1/20 Ex Parte at 1-2 (JA___-__).  Although Inteliquent (at 37-40) and

its *amici* (at 10-11) complain that Bandwidth's costs are not representative, those

critiques are misplaced, as the Commission explains (at 33-34).  In addition,

neither Inteliquent nor its *amici* contest the substance of Bandwidth's comment —

that even the lower rate cap of $0.001 can still provide them and other tandem

providers with ample revenues to continue to *pay* other companies to send them

toll-free traffic.  Also, the Commission recognized that adopting a "higher rate,"

which may allow carriers with legacy networks to continue to profit through arbitrage, could reduce the incentive for those carriers to switch from legacy network equipment to lower-cost, modern, Internet-Protocol networks, contrary to federal policy. *See Order* ¶ 62 (JA___); Commission Br. 21-22.

In the face of two competing proposals — one that had support from a broad cross-section of industry members, including the very carriers that could lower the rate even without Commission action, and a 70% higher proposal that would preserve the incentive to engage in arbitrage — the Commission's decision to select the lower proposed rate was well reasoned and justified. *See* Commission Br. 20-22.

Inteliquent contends (at 24) that the Commission's decision was unreasonable because the rates were "not intended primarily to reflect carriers' costs." But Inteliquent produced no evidence that its own, preferred rate cap was based on its or any other local telephone company's costs. *See* Commission Br. 22. In addition, the Commission has never looked to actual costs in setting arbitrage-eliminating caps in the past. For example, in setting a rate cap of $0.0007 per minute to combat arbitrage relating to calls to Internet service providers, the Commission expressly stated that it "ma[d]e no finding here regarding the actual costs incurred in the delivery of ISP-bound traffic." *ISP Remand Order* ¶ 84. This Court affirmed the Commission's denial of a petition for

forbearance from that rate cap, recognizing that the Commission's goal of deterring arbitrage was a valid policy decision grounded in economic analysis that the Court should not second-guess. *See In re Core*, 455 F.3d at 279. Nor did the Commission base its similar $0.0007 rate cap in its transition of terminating switched end office access rates on cost. *See* Report and Order and Further Notice of Proposed Rulemaking, *Connect America Fund*, 26 FCC Rcd 17663, ¶¶ 784 n.1445, 785 (2011) (JA___-__) (implementing a rate of "$0.0007 per-minute as part of the transition to bill-and-keep" despite arguments from commenters that "there is NO record evidence — no empirical data — no actual cost studies — to support imposing a single industry-wide $0.0007 rate as compensatory"). And as the Commission ably demonstrates (at 18-20), the inapposite cases that Inteliquent cites further confirm that the Commission need not set cost-based rates in these circumstances. *See*, *e.g.*, *Competitive Telecomms. Ass'n*, 87 F.3d at 529 ("The FCC is not required to establish purely cost-based rates.").

Although Inteliquent levels many attacks against the rate cap the Commission adopted, Inteliquent and its *amici* never assert that the rate cap is below *their* costs of providing service, nor did they submit evidence to the Commission to that effect, or seek a stay pending appeal to prevent the rates from going into effect on July 1, 2021. On the contrary, as the Commission observes (at 19), Inteliquent and its supporting *amici* did not supply *any* "data concerning

24

their own costs or those of any other carrier." Inteliquent instead preferred a revenue-neutral rate of $0.0017 per minute, which, as shown above, was not based on Inteliquent's costs but rather a benchmarking regime that, itself, looks to incumbent telephone companies' rates that are untethered to their current costs.

Notably, none of the companies on whose behalf Inteliquent claims to be complaining (at 36-37) has filed its own challenge to the *Order*. And, to the extent a particular local telephone company can demonstrate that the rate cap provides insufficient revenue recovery, it may seek a Total Cost and Earnings Review, *see Order* ¶ 65 (JA___), or a waiver for good cause, *see id.* ¶ 86 (JA___); *see also* Commission Br. 29-30. This Court has recognized that such processes are an appropriate means for curing any such issues, where, as here, the underlying rule is rational. *See Nat'l Rural Telecom Ass'n v. FCC*, 988 F.2d 174, 181 (D.C. Cir. 1993); *see also In re FCC 11-161*, 753 F.3d at 1136 (holding that, until a carrier seeks greater support under the Total Cost and Earnings Review Process, its challenge of insufficient return is premature).

*Amici*'s contention (at 5-6) and Inteliquent's suggestion (at 18 n.12, 35-36) that USTelecom's proposed rate cap was designed to be below cost, because its members will save more on the access charges they pay than they will lose in the charges they bill, also lack merit. USTelecom also has many members that only provide tandem services for toll-free calls and do not also purchase those services

for those calls.  And *amici*'s contention (at 4) that USTelecom is not representative because it has members that serve end users ignores that USTelecom's members include providers like Level 3 that compete directly with Inteliquent and its *amici* as intermediary providers of tandem services for other companies' end users.[15]

## CONCLUSION

The Court should deny the petitions for review.

Respectfully submitted,

 /s/ *Kevin D. Horvitz*

SCOTT H. ANGSTREICH
KEVIN D. HORVITZ
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com

*Counsel for Amicus Curiae*
*USTelecom – The Broadband*
*Association*

June 24, 2021

---

[15] *Amici* suggest (at 14) that USTelecom's pending petition for reconsideration of the *Order* is evidence that the rate cap it proposed is below cost. But USTelecom's continued support of its proposed rate cap and the *Order*, as adopted, is not contingent on the outcome of its pending petition for reconsideration.  As Inteliquent notes (at 22 n.15), that petition "challeng[es] a separate portion of the *Order* not at issue here."

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,958 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface (Times New Roman, 14 point).

 /s/ *Kevin D. Horvitz*
Kevin D. Horvitz
*Counsel for Amicus Curiae*
*USTelecom – The Broadband*
*Association*

June 24, 2021

# CERTIFICATE OF SERVICE

I hereby certify that, on June 24, 2021, I caused to be filed electronically the initial version of the Brief of USTelecom – The Broadband Association as *Amicus Curiae* in Support of Respondents with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

 /s/ *Kevin D. Horvitz*
Kevin D. Horvitz
*Counsel for Amicus Curiae*
*USTelecom – The Broadband*
*Association*